```
UNITED STATES DISTRICT COURT
  MIDDLE DISTRICT OF FLORIDA
         TAMPA DIVISION
```

ROBERTA KENNEDY,

    Plaintiff,

v.                         Case No. 8:22-cv-2646-VMC-CPT

HOME PERFORMANCE ALLIANCE, INC.,

    Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Defendant Home Performance Alliance, Inc.'s ("HPA") Motion to Dismiss the Complaint (or Stay) and Compel Arbitration, filed on December 16, 2022. (Doc. # 8). Plaintiff Roberta Kennedy responded on January 6, 2023. (Doc. # 15). With the Court's permission, HPA filed a reply (Doc. # 20), and Kennedy filed a sur-reply. (Doc. # 23). For the reasons that follow, the Motion is granted to the extent that the Court compels arbitration and stays the case pending arbitration.

**I.**     **Background**

Kennedy was employed by HPA as a territory manager from February 15, 2021, until May 17, 2021. (Doc. # 1 at 4, 6). There is no dispute that Kennedy signed an employment agreement — the Direct Seller Agreement — with HPA on February

1

15, 2021. See (Id. at 14) ("Plaintiff entered into a valid employment agreement with Defendant."); (Doc. # 8-1).

Section 20 of the Direct Seller Agreement, entitled "Legal Proceedings and Arbitration," is the agreement's arbitration provision. It provides in relevant part:

> Section 20. LEGAL PROCEEDINGS AND ARBITRATION. COMPANY AND DIRECT SELLER AGREE THAT ANY AND ALL DISPUTES, CLAIMS, OR CONTROVERSIES (HEREAFTER REFERRED TO AS A "CLAIM") ARISING UNDER OR RELATING TO THIS AGREEMENT, INCLUDING BY WAY OF EXAMPLE AND NOT AS A LIMITATION: (1) THE RELATIONSHIPS RESULTING FROM THIS AGREEMENT; (II) THE BREACH OR ALLEGED BREACH OF THIS AGREEMENT BY EITHER PARTY; (III) MATTERS ARISING FROM DIRECT SELLER'S WORK AT COMPANY, INCLUDING, BUT NOT LIMITED TO, TERMINATION, CLAIMS OF AGE, GENDER, OR DISABILITY DISCRIMINATION, SEXUAL HARASSMENT, OR CIVIL RIGHTS VIOLATIONS; OR (IV) THE VALIDITY OF THIS AGREEMENT OR THE VALIDITY OR ENFORCEABILITY OF THIS ARBITRATION PROVISION, SHALL NOT BE INITIATED OR OTHERWISE COMMENCED BY EITHER PARTY MORE THAN SIX (6) MONTHS AFTER THE DATE THAT THE RELATIONSHIP UNDER THIS AGREEMENT IS TERMINATED, REGARDLESS OF THE REASON FOR THE TERMINATION, AND THAT DIRECT SELLER AND COMPANY AGREE TO WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY THAT MIGHT OTHERWISE ALLOW FOR SUCH CLAIMS TO BE BROUGHT AFTER THIS SIX (6) MONTH PERIOD.
>
> Any Claim may at the option of either Company or Direct Seller, be adjudicated by final and binding arbitration under one (1) arbitrator in accordance with the Code of Procedure of the Forum in effect at the time the demand for arbitration is made. Notice of the demand for arbitration will be filed with the Forum by the party asserting the Claim, and the demand will be copied to the other party to this Agreement. Further information may be obtained and claims may be filed at any office of the Forum, www.adrforum.com. The findings of such arbitrator shall be final and binding on all parties to this Agreement, and may include an award of filing fees. The parties shall share equally in any applicable filing fees and costs of the arbitration, unless the Direct Seller can prove that Direct Seller is financially unable to pay the initial case or filing fees of the arbitration, and then Company shall

be responsible for the initial case or filing fees. Each party shall be responsible for its own legal fees, unless otherwise determined by the arbitrator. The arbitrator shall apply, as applicable, federal law or the law of the state in which the services were primarily rendered, for substantive law and law of remedies. The demand for arbitration shall be made by the party asserting or compelling the arbitration within a reasonable time after the Claim in question has arisen, and in no event shall any such demand be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations.

. . . If any term or clause of this arbitration provision is found to be unenforceable or in violation of applicable state law, Company and Direct Seller shall treat this arbitration provision as if that term or clause did not exist, and the remainder of this arbitration provision shall remain in full force and effect. . . .

BOTH COMPANY AND DIRECT SELLER ARE HEREBY AGREEING TO CHOOSE ARBITRATION, RATHER THAN LITIGATION OR SOME OTHER MEANS OF DISPUTE RESOLUTION TO ADDRESS THEIR GRIEVANCES OR ALLEGED GRIEVANCES WITH THE EXPECTATION THAT THIS RESOLUTION PROCESS MAY BE MORE COSTEFFECTIVE AND EXPEDIENT FOR THE PARTIES THAN LITIGATION. BY ENTERING INTO THIS AGREEMENT AND THIS ARBITRATION PROVISION, BOTH PARTIES ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY, AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION, OTHER THAN AS SET FORTH IMMEDIATELY BELOW.

1. The parties agree that due to the possible immediate and irreparable harm from a violation of the restrictive covenant sections of this Agreement, these arbitration requirements shall not apply to any restrictive covenant provisions, rights, and legal remedies contained elsewhere in this Agreement.

2. If there is a small claims court (or an equivalent type of court) located within the county and state in which Direct Seller resided during Direct Seller's work with Company, Direct Seller may, in accordance with the rules of that small claims court, choose to bring (and must then keep) Direct Seller's own claim in that small claims court.

```
3. Direct Seller may notify Company in writing (see Section
titled "Notice") within ten days of Direct Seller's execution
of this Agreement stating clearly that Direct Seller rejects
the arbitration option and other provisions of this Section,
and thereafter neither Company nor Direct Seller may invoke
the  arbitration  provision  of  this  Section  without  the
agreement of the other party. Upon such rejection by Direct
Seller, all commissions payable to Direct Seller under this
Agreement, as of the date such rejection is received by
Company and going forward, shall be reduced by five percent
(5%) of the amount of such commission.
```

(Doc. # 8-1 at 15-17).

On November 17, 2022, Kennedy filed this case, asserting claims for violations of the Florida Civil Rights Act ("FCRA"), Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act ("ADA"), and for breach of employment agreement. (Doc. # 1). Kennedy alleges that she has not been fully paid her commissions owed under the Direct Seller Agreement. (Id. at 14). She also alleges that HPA engaged in sex and disability discrimination, as well as retaliation, against her. (Id. at 7-14).

Now, HPA seeks to compel arbitration of Kennedy's claims and dismiss this case pursuant to Section 20 of the Direct Seller Agreement. (Doc. # 8). The Motion is fully briefed (Doc. ## 15, 20, 23), and ripe for review.

## II. Legal Standard

In enacting the Federal Arbitration Act (FAA), Congress set arbitration agreements on equal footing with all other

contracts. 9 U.S.C. § 2. Under the FAA, pre-dispute agreements to arbitrate "evidencing a transaction involving commerce" are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Id. The FAA reflects a "liberal federal policy favoring arbitration," AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011), but courts can only require parties to arbitrate if the parties have agreed to do so. Hanover Ins. Co. v. Atlantis Drywall & Framing LLC, 611 F. App'x 585, 588 (11th Cir. 2015); see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) (discussing the strong federal policy supporting arbitration). As such, arbitration agreements must be "rigorously enforce[d]" by the courts according to their terms. Walthour v. Chipio Windshield Repair, LLC, 745 F.3d 1326, 1329-30 (11th Cir. 2014).

"[T]he FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." Lambert v. Austin Ind., 544 F.3d 1192, 1195 (11th Cir. 2008) (citing 9 U.S.C. §§ 2-4). "There are three

5

factors courts consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived." Senti v. Sanger Works Factory, Inc., No. 6:06-cv-1903-ACC-DAB, 2007 WL 1174076, at *2 (M.D. Fla. Apr. 18, 2007).

State law generally governs whether an enforceable contract or agreement to arbitrate exists. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1368 (11th Cir. 2005); Dale v. Comcast, 498 F.3d 1216, 1219 (11th Cir. 2007) (explaining that, in reviewing the validity of arbitration agreements, contract defenses such as fraud, duress, or unconscionability are governed by state law).

### III. Analysis

HPA first argues that this Court need not review whether the parties had a valid and enforceable arbitration agreement before compelling arbitration. (Doc. # 8 at 8). According to HPA, "the Court should grant the Defendant's motion without deciding the issue of arbitrability" because "the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid." (Id.); see also Attix v. Carrington Mortg. Servs., LLC, 35 F.4th 1284,

6

1298-99 (11th Cir. 2022) (noting that "[t]here are a few basic kinds" of arbitrability questions, including "about the 'scope' or 'applicability' of the parties' arbitration agreement" and "about the 'validity' or 'enforceability' of an arbitration agreement").

### A. Law on Delegation of Arbitrability Questions

"Sometimes, parties agree not only to arbitrate the merits of any claims that arise from their contract, but also to arbitrate any 'threshold' or 'gateway' questions about the 'arbitrability' of those claims, such as questions about the 'enforceability, scope, [or] applicability' of the parties' agreement to arbitrate their claims." Attix, 35 F.4th at 1295 (citation omitted). "By default, a court would normally decide threshold disputes about whether a party's claims are arbitrable." Id. "But parties are free to have an arbitrator decide their threshold disputes instead." Id.

"An agreement to arbitrate threshold arbitrability issues is often called a 'delegation' agreement, because it delegates the resolution of disputes about the arbitrability of the parties' claims to an arbitrator." Id. "A delegation agreement is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement

7

just as it does on any other." Id. (citation and internal quotation marks omitted). "As with any arbitration agreement, before enforcing a delegation agreement, the court should ensure that the [delegation] agreement was formed, that it applies to the dispute at hand, and that no grounds render it invalid or unenforceable." Id. "Although it is the [C]ourt's obligation to determine, before enforcing a delegation agreement, that no grounds render the delegation agreement invalid or unenforceable, see 9 U.S.C. § 2, it is the parties' obligation to tell the [C]ourt what those grounds might be. In other words, it is up to the parties to specifically challenge the delegation agreement's validity or enforceability." Id. at 1295 n.8.

"Further, when analyzing whether the parties to a contract have agreed to arbitrate threshold questions of arbitrability, [courts] 'reverse[]' the FAA's standard 'presumption' favoring arbitration." Id. at 1295 (citation omitted). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Id. (citation omitted). "Thus, unlike with agreements to arbitrate the merits of the parties' claims arising from their contract, [courts] resolve ambiguities in an agreement to arbitrate

8

questions about the arbitrability of those claims in favor of the party opposing arbitration." Id. at 1295-96. "However, if the [C]ourt finds that the parties have clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator, it 'must respect the parties' decision as embodied in the contract.'" Id. at 1296 (citation omitted). "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." Id. (citation omitted).

**B.     Delegation Provision**

Again, HPA contends that Section 20 of the Direct Seller Agreement contains a valid delegation agreement, which requires this Court to compel arbitration without resolving arbitrability questions about the arbitration provision as a whole. (Doc. # 8 at 8).

In response, Kennedy argues that the language regarding delegation is void because it is nested within Section 20's six-month litigation limit provision, which is void under Florida law. (Doc. # 15 at 4). She maintains that the entire first paragraph of Section 20, which contains the language about "the validity or enforceability of this arbitration provision" and the six-month litigation limit, is void (and,

9

further, that the entire Section 20 is void). Thus, she reasons, delegation of questions of arbitrability to the arbitrator is impermissible. (Id. at 5).

Kennedy's interpretation of Section 20 is incorrect. True, the language regarding "the validity or enforceability of this arbitration provision" and the six-month litigation limit are both included within the first paragraph of Section 20. The first paragraph of Section 20 begins by defining "any and all disputes, claims, or controversies" by the term "Claim." Then, the first paragraph goes on to specify that the subset of "Claims" that "aris[e] under or relat[e] to this agreement, including by way of example and not as a limitation: . . . (iv) the validity of this agreement or the validity or enforceability of this arbitration provision" must be initiated within six months of the direct seller's termination. See (Doc. # 8-1 at 15) ("COMPANY AND DIRECT SELLER AGREE THAT ANY AND ALL DISPUTES, CLAIMS, OR CONTROVERSIES (HEREAFTER REFERRED TO AS A 'CLAIM') ARISING UNDER OR RELATING TO THIS AGREEMENT, INCLUDING BY WAY OF EXAMPLE AND NOT AS A LIMITATION: . . . (IV) THE VALIDITY OF THIS AGREEMENT OR THE VALIDITY OR ENFORCEABILITY OF THIS ARBITRATION PROVISION, SHALL NOT BE INITIATED OR OTHERWISE COMMENCED BY EITHER PARTY MORE THAN SIX (6) MONTHS AFTER THE

DATE THAT THE RELATIONSHIP UNDER THIS AGREEMENT IS TERMINATED . . .").

True, the first paragraph is void to the extent it contains a six-month litigation limit to bring any claims. Section 95.03, Fla. Stat., provides: "Any provision in a contract fixing the period of time within which an action arising out of the contract may be begun at a time less than that provided by the applicable statute of limitations is void." Fla. Stat. § 95.03; see also GBMC, LLC v. Proset Sys., Inc., No. 3:11-CV-442-MW/EMT, 2013 WL 1629162, at *1 (N.D. Fla. Apr. 16, 2013) ("Florida law makes plain that parties may not shorten the applicable statute of limitations through a contractual agreement."). Notably, the parties do not dispute that the Direct Seller Agreement is governed by Florida law. (Doc. # 8 at 7; Doc. # 20 at 2; Doc. # 23 at 2); see also Moreira v. Franca, No. 15-21439-CIV, 2016 WL 4808955, at *3 n.1 (S.D. Fla. Feb. 3, 2016) ("Florida applies the law of lex loci contractus in determining which law governs the interpretation of a contract. Since the parties executed their Employment Agreement in Florida, it is governed by Florida law." (citing State Farm Mut. Auto Ins. Co. v. Roach, 945 So. 2d 1160, 1163-64 (Fla. 2006))).

11

In its reply, HPA seems to argue — without citation to on-point authority — that Section 95.03 does not void the six-month litigation limit as to any of Kennedy's claims brought under federal law. (Doc. # 20 at 3). Even if HPA's argument was supported by the cited case law, Kennedy is also asserting a claim under Florida law in Count XIII for breach of employment agreement based on her unpaid wages. (Doc. # 1 at 14). This claim has a statute of limitations much longer than six months and is undoubtedly subject to the terms of Section 95.03. See Fla. Stat. §§ 95.11(2)(b) & (4)(c) (setting a statute of limitations of two years for a claim of unpaid wages and five years for a claim for breach of a written contract). Because the six-month litigation limit violates Fla. Stat. § 95.03 and the Direct Seller Agreement is governed by Florida law, the six-month litigation limit is void.

Despite Kennedy's argument to the contrary (Doc. # 15 at 4-5), however, the void six-month litigation limit is severable from the rest of Section 20. "Generally speaking, an unenforceable provision is severable if it 'does not go to the heart of the [arbitration agreement].'" Osprey Health Care Ctr., LLC v. Pascazi by & through Outwater, 329 So. 3d 177, 187 (Fla. 2d DCA 2021) (quoting Hochbaum ex rel. Hochbaum v. Palm Garden of Winter Haven, LLC, 201 So. 3d 218, 223 (Fla.

12

2d DCA 2016)). "Stated differently, if an arbitration agreement is otherwise enforceable, a 'court should sever the offending provisions . . . so long as such severance does not undermine the parties' intent.'" Id. (quoting Lemos v. Sessa, 319 So. 3d 135, 142 (Fla. 3d DCA 2021)); see also Hochbaum ex rel. Hochbaum, 201 So. 3d at 222 ("[T]he controlling issue is whether an offending clause or clauses go to the very essence of the agreement." (citation and internal quotation marks omitted)).

While not dispositive, the Direct Seller Agreement notably contains two provisions expressing the parties' intent to sever any unlawful provision so that the remaining portions of the Agreement would still apply. Section 16 states that "[i]f any provision of this Agreement shall be determined by a court of competent jurisdiction to be unenforceable or invalid, then the unenforceable or invalid provision shall be excised and the remaining terms of this Agreement shall remain in full force and effect." (Doc. # 8-1 at 15). Likewise, the third paragraph of Section 20 states: "If any term or clause of this arbitration provision is found to be unenforceable or in violation of applicable state law, Company and Direct Seller shall treat this arbitration provision as if that term or clause did not exist, and the remainder of this arbitration

13

provision shall remain in full force and effect." (Id. at 16).

Furthermore, the six-month litigation limit "does not go to the heart of the arbitration clause" because the essence of Section 20 is the agreement to submit all claims to arbitration to save time and expense. Just as in the Osprey case, severance of the six-month litigation limitation as void for violating Fla. Stat. § 95.03 preserves the essence of the arbitration provision without requiring a drastic rewriting of the arbitration provision. See Osprey Health Care Ctr., LLC, 329 So. 3d at 188 (concluding that "the 'essence' of the agreement is the parties' mutual intent to resolve their disputes by arbitration, not litigation" and "its financial heart was the reduced costs and time-saving benefits accompanying arbitration" such that the shortened statute of limitations provision did not "'go to the heart of the contract[],' and severing it would 'not require a drastic rewriting of the agreement[ ] and would preserve the intent of the parties to adjudicate their disputes in arbitration'" (citations omitted)). In short, the six-month litigation limit in Section 20's first paragraph is severable from the remainder of Section 20. See Jackson v. Cintas Corp., 425 F.3d 1313, 1317 (11th Cir. 2005) (applying Georgia law and

14

stating: "It is undisputed that the arbitration clause contained an illegal provision that purported to limit the time in which Jackson could bring claims against Cintas, but the arbitration clause also contained a severability provision. Jackson argues that the illegal provision invalidated the entire arbitration clause. Cintas argues that the agreement provides for severance of the invalid provision, which means that the remainder of the arbitration clause is still enforceable. We agree with Cintas.").

In severing the six-month litigation limit from Section 20, the Court need not ignore the rest of the language in the first paragraph that defines the term "Claim" and its parameters. Again, the definition of "Claim" (and its subset regarding "the validity or enforceability of this arbitration provision") are not void. Only the requirement that the specified subset of "Claims" be initiated within six months is void and has been severed. Thus, the Court agrees with HPA that the first paragraph's definition of "Claim," which is used later in Section 20, still applies. (Doc. # 20 at 3).

C.  **Clear and Unmistakable Evidence**

That leaves the question of whether the parties clearly and unmistakably evinced an intent to delegate arbitrability questions to the arbitrator. The answer is yes.

15

Importantly, the delegation provision of Section 20 is embodied in the second paragraph — not the first paragraph. Although the first paragraph defines "Claim" and describes a subset of "Claims" that includes disputes about the validity and enforceability of the arbitration provision, it is the second paragraph that states that "Any Claim" — meaning all types of "Claims" — may be arbitrated at the request of either HPA or Kennedy.[1] (Doc. # 8-1 at 15). Thus, the second paragraph creates the duty to arbitrate — not the first paragraph. And, given the explanation of the term "Claim" from the first paragraph of Section 20, "Any Claim" as referenced in the second paragraph necessarily includes the subset of "Claims" about "the validity of this agreement or the validity or enforceability of this arbitration provision" described in the first paragraph.[2] Thus, the subset of "Claims" about "the

---

[1] Also, a later paragraph of Section 20 more forcefully states that HPA and Kennedy were "agreeing to choose arbitration, rather than litigation," and were "giving up their constitutional right to have any dispute decided in a court of law before a jury, and instead [were] accepting the use of arbitration" except under three circumstances that do not apply here. (Doc. # 8-1 at 16).

[2] HPA interprets the definition of "Claim" a bit differently than the Court. HPA appears to contend that the first paragraph of Section 20 defines a "Claim" as "any and all disputes, claims, or controversies" "arising under or relating to this agreement, including by way of example and not as a limitation: . . . (iv) the validity of this agreement

validity of this agreement or the validity or enforceability of this arbitration provision" are subject to the arbitration requirement. See Caruso v. J&M Windows, Inc., No. CV 18-770, 2018 WL 4579691, at *3 (E.D. Pa. Sept. 24, 2018) (holding, in case with nearly identical arbitration provision language,

---

or the validity or enforceability of this arbitration provision." (Doc. # 8 at 8). Thus, in HPA's eyes, only disputes, claims, or controversies "arising under or relating to this agreement" fit the definition of a "Claim." See Caruso v. J&M Windows, Inc., No. CV 18-770, 2018 WL 4579691, at *3 (E.D. Pa. Sept. 24, 2018) (stating, regarding a nearly identical arbitration provision, that "[t]he first clause of the arbitration provision defines 'claim' as 'any and all disputes, claims, or controversies . . . arising under or relating to this agreement, including by way of example and not as a limitation . . . the validity of this agreement or the validity or enforceability of this arbitration provision.'").

But the phrase "(hereafter referred to as a 'Claim')" (1) comes immediately after the phrase "any and all disputes, claims, or controversies" and (2) comes immediately before the phrase "arising under or relating to this agreement, including by way of example and not as a limitation: . . . ." (Doc. # 8-1 at 15). Thus, the better interpretation is that a "Claim" is simply defined as "any and all disputes, claims, or controversies," with the phrase "arising under or relating to this agreement" merely describing the subset of "Claims" that were subject to the six-month litigation limitation. However, if HPA is correct in its interpretation of the defined term "Claim," then the parties' intent to delegate arbitrability questions is still clear and unmistakable. See Caruso, 2018 WL 4579691, at *4 (holding that the nearly identical delegation language "plainly commits the issue of arbitrability to the arbitrator"). Under either interpretation, the language "Any Claim" includes disputes about "the validity or enforceability of this arbitration provision."

17

that "[t]he language of the arbitration provision of the Sales Representative Agreement plainly commits authority over gateway issues such as arbitrability to the arbitrator").

While Subsection 20 could have been written more artfully, the language regarding what qualifies as a "Claim" (and whether a claim regarding the validity and enforceability of the arbitration agreement is subject to arbitration) is not ambiguous. See Whertec, Inc. v. Salmon, No. 3:20-cv-1254-BJD-PDB, 2021 WL 3555676, at *2 (M.D. Fla. Apr. 28, 2021) ("A contract is not ambiguous just because the parties disagree over its meaning or it is poorly drafted."); Eagle Am. Ins. Co. v. Nichols, 814 So. 2d 1083, 1085 (Fla. 4th DCA 2002) (stating in the context of an insurance contract that "a policy is not ambiguous merely because it is complex and requires analysis to interpret it"). Because the Direct Seller Agreement made clear that (1) the term "Claim" encompasses, among other things, disputes about "the validity or enforceability of this arbitration provision" and (2) that the parties agreed to arbitrate "Any Claim," the parties have clearly and unmistakably agreed to delegate arbitrability questions about "the validity or enforceability of this arbitration provision" to the arbitrator.

18

This ends the Court's inquiry. Arbitration must be compelled so that the arbitrator can address the threshold arbitrability questions delegated by Section 20 of the Direct Seller Agreement. See Attix, 35 F.4th at 1296 (citation omitted) ("[I]f the court finds that the parties have clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator, it 'must respect the parties' decision as embodied in the contract.'" (citation omitted)). Any arguments Kennedy has regarding the validity or enforceability of the arbitration agreement should be raised before the arbitrator.

### D. Stay Pending Arbitration

HPA requests that the Court dismiss this action while arbitration is pending. However, actions should generally be stayed, not dismissed, pending arbitration. See Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 699 (11th Cir. 1992) ("The district court properly found that the state law claims were subject to arbitration, but erred in dismissing the claims rather than staying them. Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration." (citing 9 U.S.C. § 3)). Thus, this case shall remain stayed pending the arbitration proceedings. The parties will be required to file

a status report ninety days from the date of this Order, and every 90 days thereafter.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Home Performance Alliance, Inc.'s ("HPA") Motion to Dismiss the Complaint (or Stay) and Compel Arbitration (Doc. # 8) is **GRANTED** in part.

(2) The case is referred to arbitration.

(3) The Clerk is directed to **STAY** and **ADMINISTRATIVELY CLOSE** the case pending arbitration.

(4) The parties are directed to file a joint status report by **May 1, 2023,** and every 90 days thereafter.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 6th day of February, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE